TROY S. LEONG, a minor, by his next friend, GAIL M. PETAGNO, Plaintiff-Appellant, *v.* DENNIS TAKASAKI, Defendant-Appellee.

NO. 5349

MARCH 28, 1974

RICHARDSON, C.J., LEVINSON, KOBAYASHI AND OGATA, JJ., CIRCUIT JUDGE CHANG ASSIGNED BY REASON OF VACANCY

,OPINION OF THE COURT BY RICHARDSON, C.J.

Plaintiff-appellant Troy Leong, through his next friend Gail Petagno, brought this action to recover damages for nervous shock and psychic injuries suffered without accompanying physical impact or resulting physical consequences or manifestations thereof, when he witnessed his stepgrandmother, Mrs. Louise J. Pittala, being struck and killed by an automobile driven by defendant-appellee Dennis Takasaki. From the trial court's grant of defendant's motion for summary judgment, this appeal was taken.

I

At approximately 7:00 p.m. on the evening of January 7, 1972, plaintiff, who was 10 years old at the time, and Mrs.

Pittala, his stepfather's mother, alighted from a kokohead-bound bus near the intersection of Kalanianaole Highway and Waiele Street in Honolulu, and proceeded to cross Kalanianaole Highway walking hand-in-hand in the crosswalk from the makai to the mauka side of the highway.[1] Defendant was driving an automobile in the middle lane of three lanes on Kalanianaole Highway in a kokohead direction at approximately 35 miles per hour. Defendant admitted that he did not see Mrs. Pittala until the moment of impact. Plaintiff saw the vehicle approach him, and stopped walking when he realized that it was not going to stop. Mrs. Pittala either did not see the vehicle or believed that it was going to stop and continued walking. She was struck and killed instantly by the vehicle. Although plaintiff stood several feet from Mrs. Pittala at the point of impact, no part of the car touched him and he suffered no physical injuries at the time. He alleges in his complaint that he sustained "nervous shock to his entire system and the injuries to his psyche are of a permanent nature," but no resulting physical injuries are alleged.

Plaintiff's natural and legal mother is Gail M. Petagno, the wife of Neil S. Petagno. Mrs. Pittala, who was the natural and legal mother of Neil Petagno, had lived with her son and daughter-in-law since moving to Hawaii from the mainland several months previously. Plaintiff alleges that his relationship to Mrs. Pittala was an extremely close one, and that she cared for him as if she were his natural grandmother.

Defendant moved for summary judgment under Rule 56(c), H.R.C.P., on the grounds that as a matter of law, there can be no recovery in tort on a claim for mental distress suffered without physical injury. Although both sides submitted memoranda of law on the question to the trial court, neither party submitted affidavits to clarify the material facts in this case. No transcript was preserved of oral argument on the motion. The trial court granted defendant's motion, and ordered summary judgment in favor of the defendant.

---

[1] In this opinion, the Hawaiian words indicating direction are translated as follows: *mauka* means toward the mountain, or north; *makai* means toward the ocean or south, and *kokohead* is a volcanic crater in an easterly direction from this intersection.

II

Rule 56, H.R.C.P., states in pertinent part:

The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

This court, in *Abraham v. Onorato Garages,* 50 Haw. 628, 631-32, 446 P.2d 821, 825 (1968), has stated that:

Where the defendant is the moving party, there is no genuine issue as to any material fact and the defendant is entitled to a judgment as a matter of law if, upon viewing the record in the light most favorable to the plaintiff, it is clear that the plaintiff would not be entitled to recover under any discernible theory.

We have also held that the burden "is upon the party moving for summary judgment to demonstrate clearly that there is no genuine issue of fact,'' and any doubt as to the existence of such issues must be resolved against him. *State v. Zimring,* 52 Haw. 472, 475, 479 P.2d 202, 204 (1970).

From defendant's memorandum in support of his motion and from plaintiff's deposition, it is apparent that plaintiff had never consulted a doctor for treatment of his alleged nervous shock or psychic injuries. However, plaintiff's statements that his grades in school had dropped immediately after the accident but had subsequently risen to their previous level and that he thinks about the accident at times are indications of possible psychic damage. Thus plaintiff's statements create a disputed issue of material fact. We cannot conclude from this record that the defendant has met his burden of clearly proving that plaintiff suffered no compensable injuries and that no genuine issues of material fact remain for trial.

Nor can we conclude that defendant is entitled to summary judgment as a matter of law. The right of a plaintiff to maintain an action in damages for mental or emotional disturbance unaccompanied by the infliction of contem-

poraneous physical injury or not resulting in physical injury is a most unsettled question in the law of torts, an area "clearly in a process of growth, the ultimate limits of which cannot as yet be determined." Prosser, *Torts* 50, § 12 (4th ed. 1971). We have previously reversed an entry of summary judgment where we believed that a final decision in a case of such vast public importance should not be based on a limited and indefinite factual foundation, *State v. Zimring*, 52 Haw. 472, 476, 479 P.2d 202, 204-05 (1970) (case involving title to shoreline property formed by volcanic eruption), and we feel this case merits similar treatment. In remanding to the trial court for a full determination of this case, it is desirable that we express some guidelines on the question.

We therefore reverse and remand for further proceedings in accordance with this opinion.

III

Defendant contends that no claim for relief exists in favor of a bystander witness to a motor vehicle-pedestrian accident when (1) the bystander sustains no physical impact and suffers emotional distress alone without either consequent physical injury or the objective manifestations of mental damage, and (2) the witness is not a member of the injured party's immediate family but is only related by distant affinity.

The traditional rule in tort law is that there is no recovery for the negligent infliction of mental distress alone, unless accompanied by physical impact or resulting in physical injury or objective manifestations thereof. *Restatement Second, Torts* 461, § 436A (1965). The considerations underlying this treatment of mental distress only as parasitic damages are (1) a fear of fraudulent claims; (2) the potential of unlimited and indefinite liability for every type of mental disturbance; (3) unforeseeability of the injury; and (4) the imposition of burdensome and disproportionate liability on the tortfeasor in relation to his culpability. In order to avoid factual questions which involve these difficulties, courts have not employed general tort principles but have resorted to artificial standards or a search for special circumstances that guarantee a

claim for relief is not spurious. Prosser, *Torts* 330, § 54 (4th ed. 1971).

However, this court has not hesitated to grant negligently-inflicted mental distress unaccompanied by resulting physical injuries independent legal protection. In *Rodrigues v. State,* 52 Haw. 156, 472 P.2d 509 (1970), we permitted recovery in tort for mental distress suffered as a result of property damage to plaintiffs' home caused by the state's negligence. Subsequently, in *Dold v. Outrigger Hotel,* 54 Haw. 18, 501 P.2d 368 (1972), we permitted recovery in tort for emotional distress and disappointment, in addition to damages for out-of-pocket losses, where a contract is broken in a wanton or reckless manner.

Defendant contends that the majority opinion in *Rodrigues* "flies in the face of the entire jurisprudence of this country." Moreover, he argues that if the decision in *Rodrigues* is applicable to the negligent interference with plaintiff's enjoyment of his dwelling, it should not be applicable to the facts in the instant case. We believe that *Rodrigues* applies here. Because other standards exist to test the authenticity of plaintiff's claim for relief, the requirement of resulting physical injury, like the requirement of physical impact, should not stand as another artificial bar to recovery, but merely be admissible as evidence of the degree of mental or emotional distress suffered.

A survey of cases from other jurisdictions does not show the development of a logical and consistent rule, but reveals that the trend is a hesitant abandonment of such artificial restrictions and barriers to recovery in favor of a greater reliance on general tort law principles and the contemporary sophistication of the medical profession to test the veracity of claims for relief. While a majority of courts have allowed independent recovery only for the intentional infliction of mental distress, a significant minority first permitted recovery for the negligent infliction of mental distress only as a parasitic tort, or as an independent tort in special situations, such as the negligent transmission of a message and the negligent mishandling of corpses where, on its face, there is a special likelihood that mental distress will result. *Id.* at 52,

329, §§ 12, 54; *Western Union Tel. Co. v. Crumpton*, 138 Ala. 632, 36 So. 517 (1903) (negligent transmission of message); *Carey v. Lima, Salmon & Tully Mortuary*, 168 Cal. App. 2d 42, 335 P.2d 181 (Dist. Ct. App. 1959) (negligent embalming).

The absolute bar to recovery for negligently-inflicted emotional damages next gave way to relief for mental distress as a parasitic tort when accompanied by physical impact. Prosser, *Torts, supra* at 331, § 54. The requirement of impact, which is supposed to guarantee the mental disturbance is genuine, has in recent years been satisfied by such minor contact as dust in the eye and smoke inhalation, which played no part in causing the actual harm. *Id.*, at 331, § 54; *Morton v. Stack*, 122 Ohio St. 115, 170 N.E. 869 (Sup. Ct. 1930) (recovery allowed for physical injuries resulting from emotional distress where only physical contact was smoke inhalation); *Porter v. Delaware, L. & W.R. Co.*, 73 N.J.L. 405, 63 A. 860 (Sup. Ct. 1906) (dust in eye). Other courts have subsequently allowed recovery in the absence of impact, where the plaintiff was in the "zone of danger," the area of possible physical peril when the negligent act occurred. *Waube v. Warrington*, 216 Wis. 603, 615, 258 N.W. 497, 509 (1935). Still other courts have permitted recovery if the plaintiff, though untouched, feared for his own safety. *Amaya v. Home Ice, Fuel & Supply Co.*, 59 Cal. 2d 295, 379 P.2d 513, 29 Cal. Rptr. 33 (1963). A plaintiff standing within the zone of danger was presumed to have suffered emotional distress because he feared for his physical well-being.

Recent decisions have struck down such artificial bars to recovery for mental distress. Yet these jurisdictions will permit such recovery only if mental distress resulted in physical injury. A close analysis of the cases reveals, however, that the requirement of resulting physical injury is employed as yet another of the artificial devices to guarantee the genuineness of the claim, which may actually foreclose relief to a genuine claim.

The seminal case is *Dillon v. Legg*, 68 Cal. 2d 728, 441 P.2d 912, 69 Cal. Rptr. 72 (1968). The plaintiff in that case, in close proximity to the accident but admittedly outside of the zone of danger, witnessed defendant's automobile strike and

kill her infant daughter. She alleged in her complaint that because of defendant's negligence she suffered emotional disturbance, shock, and injury to her nervous system which caused her physical and mental pain and suffering. She also sought damages for the emotional distress suffered by a second daughter who witnessed the collision in close proximity to it.

The court noted that the case illustrated the artificiality of the zone of danger rule, which would deny recovery to the mother of the decedent but permit it to the sister merely because she was several yards closer to the accident, and therefore presumed to have feared the danger of impact. *Id.* at 733, 441 P.2d at 915, 69 Cal. Rptr. at 75. The court reasoned that recovery should be had in this case if the defendant "should foresee fright or shock severe enough to cause substantial injury in a person normally constituted." *Id.* at 740, 441 P.2d at 920, 69 Cal. Rptr. at 80. If so, plaintiffs could be considered to be within the zone of foreseeable risk. The court could not "doubt that a mother who sees her child killed will suffer physical injury from shock." *Id.* at 737, 441 P.2d at 917, 69 Cal. Rptr. at 77. Hence, the court found the accident and risk of emotional harm in that case were reasonably foreseeable, and the court concluded that the plaintiff had established a prima facie case.

Virginia, Rhode Island, and Michigan have followed California's lead. In *Hughes v. Moore,* 214 Va. 27,____, 197 S.E.2d 214, 219 (1973) the Virginia Supreme Court permitted recovery for emotional disturbance and physical injury resulting therefrom in the absence of physical impact where plaintiff can prove that his "physical injury was the natural result of fright or shock proximately caused by the defendant's negligence."

The Rhode Island Federal District Court, in *D'Ambra v. United States,* 354 F. Supp. 810 (D. R.I. 1973) (modified on other grounds, 481 F.2d 14 (1st Cir. 1973) ), denied a motion to dismiss an action brought under the Federal Tort Claims Act for injuries sustained as a result of the shock and physical manifestations thereof suffered by plaintiff from witnessing her infant son being struck and killed by a United States mail

truck. Applying Rhode Island law, the court concluded that the negligent infliction of mental harm could exist as an independent cause of action. The court found that under Rhode Island law, recovery for mental anguish is only allowed when there are subsequent physical manifestations of psychic injury.

The court cited as authority *Simone v. Rhode Island Co.*, 28 R.I. 186, 66 A.202 (1907), in which the Rhode Island Supreme Court, "considering in a practical common sense way the inextricable intertwining of mental and physical processes, . . . anticipated the recognition of modern medicine that all emotional disturbances have physical ramifications. *D'Ambra v. United States, supra*, 354 F. Supp at 814. The court in *Simone* called illogical the reason given for refusing damages sustained from mere fright unaccompanied by any perceptible physical effects that "in practice it is impossible satisfactorily to administer any other rule." *Simone v. Rhode Island Co., supra*, 28 R.I. at 194-96, 66 A. at 205-06.

The Michigan courts have also pointed out the artificiality of the resulting physical injury requirement. In *Daley v. LaCroix*, 384 Mich. 4, 12-13, 179 N.W.2d 390, 395 (1970), the Michigan Supreme Court permitted a plaintiff to recover damages for definite and objective physical injury produced as a result of defendant's negligent conduct, notwithstanding the absence of any physical impact upon the plaintiff. The court concluded that plaintiff's sudden loss of weight, inability to perform ordinary household duties, extreme nervousness, and irritability are facts from which a jury could find or infer compensable physical injury. The Michigan Court of Appeals, interpreting *Daley*, held that the scope and meaning of "definite and objective physical injury" is delineated by the facts of each case. In *Toms v. McConnell*, 45 Mich. App. 647, 657, 207 N.W.2d 140, 145 (Ct. App. 1973), the court found that a deceased child's mother who, as a result of seeing her daughter killed, has withdrawn from normal forms of socialization, was for a period of nine months following the accident unable to function as she did previously; and continues in a state of depression, has suffered a

physical injury of the same magnitude as the plaintiff in *Daley*.

IV

Having concluded that the physical impact and resulting physical injury requirement should not stand as bars to recovery in this case, we turn to a discussion of duty and the considerations which have led courts to avoid facing the question of negligence. As in all tort cases, the trial court on remand must determine (1) if the defendant owed a duty of due care to the plaintiff and therefore is liable for a breach of that duty, and (2) if defendant is liable, how to prove and assess damages.

As to the question of duty, in *Rodrigues v. State, supra* at 170, 472 P.2d at 518, we characterized the paramount issue as:

> . . . whether the plaintiff's interest in freedom from mental distress is entitled to legal protection from defendant's conduct.

Defining duty as a legal conclusion dependent upon "the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection," we proceeded to weigh the considerations favoring plaintiff's recovery against those favoring a limitation on defendant's liability.

We stated in *Rodrigues, supra* at 171, 472 P.2d at 519, that if the danger of fraud and undue and unlimited liability were responsible for the treatment of damages for mental distress in the form of incidental or parasitic damages, the "preferable approach is to adopt general standards to test the genuineness and seriousness of mental distress in any particular case."

On the question of fear of fraud, we stated in *Rodrigues, supra* at 172, 472 P.2d at 520: "The general standard of proof required to support a claim of mental distress is some guarantee of genuineness" in each case and thus we see no reason to deny this claim for relief for fear of fraud. The California Supreme Court in *Dillon v. Legg, supra* at 737, 441 P.2d at

917-18, 69 Cal. Rptr. at 77-78, similarly did not believe the possibility of fraudulent assertions in isolated cases justified a wholesale rejection of the class of claims in which the possibility arose. In an appropriate case, and whenever the facts and circumstances in a particular case so demand, the trial court can formulate appropriate instructions to the jury to avoid the possibility of fraud.

In *Rodrigues,* we felt the problems posed by the fear of unlimited liability would be settled by limiting recovery to claims of serious mental distress. Thus we held that:

> . . . serious mental distress may be found where a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case. *Rodrigues v. State, supra* at 173, 472 P.2d at 520.

We concluded that freedom from negligent infliction of serious mental distress is entitled to independent legal protection, and therefore established that "a duty to refrain from the negligent infliction of serious mental distress" exists in this state. Where serious mental distress to plaintiff was a reasonably foreseeable consequence of defendant's act, defendant's liability would be imposed by the application of general tort principles. *Id*. at 174, 472 P.2d at 520. We believe that the standard of duty established in *Rodrigues* should be applied in the instant case on remand to determine defendant's liability.

The courts in *Dillon v. Legg, supra* and *D'Ambra v. United States, supra,* employed a foreseeability approach to determine whether defendant would be liable for damages for plaintiff's shock upon witnessing the accident. In *Dillon,* the court set out the following guidelines to indicate the extent of defendant's liability in future cases:

> . . . (1) Whether the plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were

closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. *Dillon v. Legg, supra* at 740-41, 441 P.2d at 920, 69 Cal. Rptr. at 80.

The court in *D'Ambra* added a fourth prerequisite to recovery — that the presence of the parent-witness must also be foreseeable. The foreseeability of his presence could be evaluated by studying (1) the child's age; (2) the type of neighborhood in which the accident occurred; (3) the familiarity of the tortfeasor with the neighborhood; (4) the time of day; and (5) any other factors which would put the tortfeasor on notice of the witness' presence. *D'Ambra v. United States, supra* at 819-20.

British courts have also taken a foreseeability approach to allow recovery for nervous shock. In *Boardman v. Sanderson* [1964] 1 W.L.R. 1317 (C.A.), the Court of Appeals upheld the award of damages for slight shock to a father who, hearing the screams of his infant son as defendant drove his automobile over the boy's leg, came to the boy's rescue. The court held that the defendant owed a duty of due care not only to the infant, but to near relatives whom he knew to be on the premises, within earshot, and likely to come upon the scene if injury befell the infant. The court's imposition of liability was based on a finding that the father's reaction to his son's predicament was reasonably foreseeable where the defendant knew that the infant was in the yard, that carelessness on his part might result in injury to the infant, and that the infant's father would come running to his assistance upon hearing the screams. Although the court noted that the father later developed symptoms of nervous shock, it did not condition recovery on the demonstration of a resulting physical injury.

That the California, Rhode Island and British courts would only impose liability upon the defendant where the reasonable driver could be expected to foresee harm to the plaintiff or others within the same range of apprehension is still another variant of the zone of danger formulation. We concluded in *Rodrigues, supra,* that the defendant would owe a duty of due care to the plaintiff where it was reasonably

foreseeable that serious mental distress to the plaintiff could result from defendant's act. However, our analysis in that case also focused on the foreseeability of the plaintiff's reaction. We now hold that when it is reasonably foreseeable that a reasonable plaintiff-witness to an accident would not be able to cope with the mental stress engendered by such circumstances, the trial court should conclude that defendant's conduct is the proximate cause of plaintiff's injury and impose liability on the defendant for any damages arising from the consequences of his negligent act.

The courts in *Dillon*, *D'Ambra* and *Boardman* tested the defendant's duty to the plaintiff on foreseeability standards rather than a proximate cause standard. Hence their criteria, the proximity of the plaintiff-witness to the accident, the manner in which he witnessed it or learned of it, his relationship to the victim and the foreseeability of his and the victim's presence to the defendant should not be employed by a trial court to bar recovery but should at most be indicative of the degree of mental stress suffered. Just as recovery should not be granted to a plaintiff who was standing within the zone of danger but denied to one standing several feet away, it should not be contingent upon the defendant's actual knowledge of plaintiff's presence. Like the court in *Dillon v. Legg, supra,* we cannot doubt that the plaintiff would suffer some degree of shock when he witnessed his foster grandmother being killed as he stood several feet away. Whether the degree of stress engendered by the circumstances of this case is beyond the amount of stress with which a reasonable man can be expected to cope is a question for the trial court.

Neither should the absence of a blood relationship between victim and plaintiff-witness foreclose recovery. Hawaiian and Asian families of this state have long maintained strong ties among members of the same extended family group. The Hawaiian word *ohana* has been used to express this concept. It is not uncommon in Hawaii to find several parent-children family units, with members of three and even four generations, living under one roof as a single family.

The Hawaiian concept of adoption also differs from that in

other common law jurisdictions.[2] The ancient Hawaiians cherished the principle of adoption, which took two forms: A child or adult one loves, but for whom one might not have exclusive care, might be adopted as a *keiki ho'okama* (child), or *kaikua'ana ho'okama, kaikaina ho'okama, kaikuahine ho'okama, kaikunane ho'okama* (adult). A child so adopted would be adopted as a child of the family, and entitled to inherit through his parents, while an adult would be adopted as a form of showing affection or respect. On the other hand, a *keiki hanai* is a child given to another to raise, as a foster child. *O'Brien v. Walker*, 35 Haw. 104, 128-30 (1939); Andrews and Parker, *Hawaiian Dictionary* 104, 158 (1922); Pukui and Elbert, *Hawaiian Dictionary* 52, 115 (1971). As adoption under the statute replaced ancient Hawaiian custom and usage, the term *ho'okama* has fallen into disuse and the term *hanai* has since been used to refer to all types of adoption. Nevertheless the custom of giving children to grandparents, near relatives, and friends to raise whether legally or informally remains a strong one. Hence the plaintiff should be permitted to prove the nature of his relationship to the victim and the extent of damages he has suffered because of this relationship.

V

The final question we face is the standard of objective proof of the nature and severity of mental distress necessary to properly assess damages in this case. A cogent analysis of this problem may be found in Comment, *"Negligently Inflicted Mental Distress: The Case for an Independent Tort"* 59 Geo. L.J. 1237, 1248-1263 (1971). From a medical perspective, negligently-inflicted mental distress may be characterized as a reaction to a traumatic stimulus, which may be physical or purely psychic. Traumatic stimulus may cause two types of mental reaction, primary and secondary. The primary response, an immediate, automatic and instinctive

---

[2] In Hawaii, unlike in the majority of mainland states and England, adopted children are considered issue of their adopting parents, and may inherit through them. HRS § 578-16; O'Brien v. Walker, 35 Haw. 104 (1939).

response designed to protect an individual from harm, unpleasantness and stress aroused by witnessing the painful death of a loved one, is exemplified by emotional responses such as fear, anger, grief, and shock. This initial response, which is short in duration and subjective in nature, will vary in seriousness according to the individual and the particular traumatic stimulus.

Secondary responses, which may be termed traumatic neuroses, are longer-lasting reactions caused by an individual's continued inability to cope adequately with a traumatic event. Medical science has identified three frequently occurring forms of neuroses resulting from trauma. In the first, the anxiety reaction, the trauma produces severe tension which results in nervousness, weight loss, stomach pains, emotional fatigue, weakness, headaches, backaches, a sense of impending doom, irritability, or indecision as long as the tension remains. The second, the conversion reaction, is a reaction to trauma in which the individual converts consciously disowned impulses into paralysis, loss of hearing, or sight, pain, muscle spasms, or other physiological symptoms which cannot be explained by actual physical impairment. The third, the hypochondriasis reaction, is characterized by an over-concern with health, a fear of illness, or other unpleasant sensations. Thus only secondary responses result in physical injury.

The severity of mental distress may be approached in terms of the amount of pain and disability caused by defendant's act. Traumatic neuroses are more susceptible to medical proof than primary reactions because they are of longer duration and usually are manifested by physical symptoms which may be objectively determined. While a psychiatrist may not be able to establish a negligent act as the sole cause of plaintiff's neurosis, he can give a fairly accurate estimate of the probable effects the act will have upon the plaintiff and whether the trauma induced was a precipitating cause of neurosis, and whether the resulting neurosis is beyond a level of pain with which a reasonable man may be expected to cope.

In a situation where only the primary response to trauma

occurs, the defendant's negligence may produce transient but very painful mental suffering and anguish. Because this reaction is subjective in nature and may not result in any apparent physical injury, precise levels of suffering and disability cannot be objectively determined. The physician or psychiatrist must rely on the plaintiff's testimony, the context in which the trauma occurred, medical testing of any physical ramifications, the psychiatrist's knowledge of pain and disability likely to result from such trauma, and even the framework of human experience and common sense to determine the amount of pain resulting naturally as a response to defendant's act, and whether it is beyond the level of stress with which a reasonable man may be expected to cope.

Thus calculation of damages becomes a simpler matter when the primary response is coupled with a secondary one, because damages may be assessed by more objective standards. Nevertheless, the absence of a secondary response and its resulting physical injury should not foreclose relief. In either event plaintiff should be permitted to prove medically the damages occasioned by his mental responses to defendant's negligent act, and the trial court should instruct the jury accordingly.

### VI

We conclude that the trial court erred in granting defendant's motion for summary judgment and that plaintiff Leong has stated a claim for relief for which recovery may be granted. On remand he must prove the nature and extent of emotional damages occasioned by defendant's negligent act.

Reversed.

*Charles S. Lotsof* for plaintiff-appellant.

*G. Richard Morry* and *Edmund Burke (Conroy, Hamilton, Gibson, Nickelsen & Rush* of counsel) for defendant-appellee.

### CONCURRING OPINION OF LEVINSON, J.

In *Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509 (1970), a majority of this court held actionable, on a theory of tortious

infliction of psychic injury, a defendant's negligent destruction of *property* which caused the plaintiff-owner to suffer mental distress. I dissented, based on "my disagreement with the policy of recognizing emotional ties to material objects and . . . the vast potential for abuse inherent in such a theory of recovery." *Id*. at 178, 472 P.2d at 522. However, I also indicated that in my view protection of the interest to be free of emotional distress resulting from a defendant's negligently inflicted "peril or harm to another closely or intimately related to the person disturbed," insofar as it recognized emotional ties between *people,* stood on a more acceptable legal footing. *Id*. at 179, 472 P.2d at 523.

I still disagree with the majority's extension of legal protection to emotional ties to property contained in *Rodrigues*. However, I concur in the court's holding in this case that the plaintiff has stated a valid claim for injury to his psyche caused by the defendant's alleged negligence in causing the death of Mrs. Pittala, to whom the plaintiff claims both close emotional and familial ties. In this regard, I also concur in the court's analysis of the standards applicable in measuring the genuineness of the plaintiff's injury.